### GENNERICH et al. v. VOIGT et al.

(Supreme Court, Appellate Division, First Department. December 15, 1899.)

FRAUDULENT CONVEYANCES—EVIDENCE.

     A debtor transferred his stock, worth $3,000, to his brother, for $1,500, which the brother testified was made up of loans to the debtor from money which he had saved from his earnings, and debts of the seller, which the brother paid; that soon after the transfer he started another store, which he placed in charge of the seller, but no profits had ever been turned over. The seller corroborated the testimony, and stated that his brother had paid debts as part of the consideration for the transfer, and that he received no salary for running the new store except such as he needed for his family. He stated that he had made no statement to a commercial agency, which was contradicted by two witnesses, who testified that he had made a statement that he owed no debts, and had $2,500 invested, and the stock valued at $2,000. Shortly before the transfer, the seller closed his bank accounts, which previously showed deposits amounting to over $1,000 a month, and his bank books disappeared. *Held,* that, the consideration for the transfer being inadequate, and the brother's testimony improbable, the finding that the transfer was fraudulent as to creditors was sustained by the evidence.

Appeal from special term.

Action by George Gennerich and others against John Voigt and another. From a judgment for defendants, plaintiffs appeal. Reversed.

The plaintiffs, as judgment creditors of the defendant John Voigt, seek to set aside, on the ground of conspiracy, fraud, and want of consideration, a bill of sale given by him on January 18, 1898, to his brother, the defendant William Voigt, transferring title to the property, fixtures, and good will of a grocery store at 1115 Park avenue for an alleged consideration of $1,500; and among the allegations of the complaint it is stated that the value of the property transferred was "upwards of the sum of $3,000." The answers of the defendants are similar, and, besides denying any fraud in the making of the bill of sale, and alleging that the same was founded upon a good and valuable consideration, they contain the statement that certain allegations of the complaint are admitted, saving "the allegation that the property therein described as belonging to the defendant John Voigt was worth upwards of the sum of $3,000." The bill of sale itself recites, in addition to the general statement and the consideration mentioned, that "it is agreed that said John Voigt shall pay all indebtedness now existing, and receive all dues now owing on any article or thing or on the books of or belonging to the said business." William Voigt testified: That, after coming to this country, 12 years ago, he worked as a grocery boy for his brother, John, in his store at Seventy-Seventh street, and in 1891, when the store was started, loaned him $450, taken from the Union Dime Savings Bank, where it was deposited, which, he stated, was saved from his earnings. That he thereafter loaned his brother the following sums: In 1893, $36; in 1894, $50; in 1896, $500; in May, 1897, $50; in June, 1897, $100; in July, 1897, $25; in August, 1897, $50; in September, 1897, $100; in November, 1897, $40; and in January, 1898, $100,—making a total of $1,501. That no receipts were given to him for these moneys, nor any notes, and that he had no memorandum, except entries made in a little book when the loans were given. That in April, 1895, he purchased for himself a grocery business in 102d street, for which he paid $1,575, half in cash and half in notes, which were signed by his brother, John, and a Mr. White, which notes, however, he had to meet. That in January, 1898, when the transfer of the Park avenue store took place, he refused to give John money which was needed to pay rent due, unless the bill of sale were made. That immediately thereafter the store was turned over to Mr. White, as the representative of J. H. Mohlman & Co., to enable them to satisfy a claim against John amounting to about $900, and that later he realized about $300 on what was left. That, soon after, he started a store at Twentieth street, and that his brother, whom he made general manager of it, has since been in full charge and has turned over no money, profits, or account. John Voigt testified that he went into the grocery business on Seventy-Seventh street in 1891, and that his brother William was then his clerk, receiving $25 a month and his board; that he sold this store in April, 1896, for $3,500, half cash and half notes, and paid all his creditors; that he had kept a bank account since 1893 in the Yorkville Bank, but has no bank books, and does not know what has become of them; that in June, 1898, he went abroad with his family for three months, and on his return had no money whatever, but, by borrowing $400 from his brother and giving notes, he purchased the Park avenue store for $1,200; that when the bill of sale was made to his brother it was agreed that, after taking enough to cover the loans, his brother was to pay what was left to creditors; that, after the transfer, he purchased the store at Ninetieth street in his brother's name, and was his manager there, receiving not a salary, but as much as he needed for his family; that the statement made by his brother as to the loans was true; that he did not recognize Mr. Wilson, a commercial agency representative, and recalled no statement made to him, and that he made no statement to the plaintiffs that he owed no money excepting to them and to J. H. Mohlman & Co. John N. Wilson testified that he was a mercantile agency reporter; that he had a conversation with the defendant John Voigt at the Park avenue store in December, 1896, when the defendant stated to him—as he had never done before on his previous visits—that he had $2,500 invested, and no liabilities; that he then and there made a

memorandum of this statement, and then estimated the stock in the store to be worth $2,000, without the fixtures. Henry Von Bremen testified that in December, 1897, John Voigt told him in conversation, when asked as to his credit, that he did not owe a cent to anybody but J. H. Mohlman & Co. and the plaintiffs; that, after the transfer of the grocery store, he was told by William that John had given him a bill of sale of it, but that Mr. White was in possession of it in order to satisfy the claim of J. H. Mohlman & Co. of about $800, after which the property was to be returned to enable him to obtain his own claim of $1,000 for borrowed money. The complaint was dismissed on the ground that the plaintiffs had not sustained the burden imposed upon them of establishing that the bill of sale was fraudulent. From the judgment so entered, the plaintiffs appeal.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

Arthur Furber, for appellants.
Cromwell G. Macy, for respondents.

O'BRIEN, J. We think, from the evidence, that the plaintiffs fairly sustained the burden placed upon them of showing that the bill of sale sought to be set aside was given to hinder, delay, and defraud creditors. As to the value of the property transferred, it will be noticed that the allegation of the complaint is that the property was worth upwards of $3,000, and this is not denied by the answers; so that, even if we conclude that the consideration of $1,500 named in the bill of sale was actually advanced, it was an inadequate price for the property. The defendants at the trial sought to show—notwithstanding the express words of the bill of sale that John was to "pay all indebtedness" existing—that it was agreed when the transfer took place that William, after satisfying his claim, was to pay to the creditors what was due them from the assets remaining. Had such an agreement been contained in the bill of sale, it would, in effect, have been a general assignment for the benefit of creditors, and, not complying with the statute permitting such assignments, would have been void. Regarding the transaction not as a general assignment for the benefit of creditors, we may infer from the conduct of the parties that the plan adopted was really one to permit J. H. Mohlman & Co. to obtain the amount due them, to the exclusion of other creditors, and reserve the balance for William Voigt in payment of alleged loans.

There is in evidence no memorandum or receipt or bank book of either of the defendants, which, if produced, would have been of great value in support of their claim that the loans were made. There is, besides, an inherent improbability in their statements. It seems improbable, when working for his brother at such a small salary, that William would have available $450 to make the first loan claimed. Similarly, that John, after selling out his business in 1896, when, in his own words, he "paid all his creditors," should still be indebted to William,—especially at a time when William was still in debt for the new grocery store on 102d street, which he had purchased partly on John's credit; that he should go abroad with his family for three months, and return penniless, and at once obtain from William $400 with which to enter business again. It

will be noticed that John's credit was the better, for his name was signed to the notes which William was to pay. And it is significant that just before the transfer the account in the Yorkville Bank was closed, and the bank books unaccountably disappeared, although the record of deposits would indicate an even and prosperous business, with receipts averaging at least $1,100 for months prior to the time deposits ceased. We have, besides, the testimony of two witnesses, opposed to that of John Voigt, that before the transfer he stated to one, in December, 1896, that he had no liabilities, and in December, 1897, to the other, that his only indebtedness was to the plaintiffs and to J. H. Mohlman & Co. One of these witnesses is a reporter of a mercantile agency, having no direct interest involved, who had made previous visits to the store, but whom the defendant said he did not even recognize. The reporter's testimony that the stock alone was worth about $2,000 is another proof that the consideration named in the bill of sale was inadequate. And that the sum stated of $1,500 was accurate, if any amount was due, is rendered doubtful by the plaintiffs' testimony that William mentioned $1,000 as the total sum borrowed. Our conclusion that the plan was one to defraud creditors is founded not only on what had taken place prior to the making of the bill of sale, its terms, and the circumstances at the time it was given, but also by the subsequent conduct of the defendants. Within a short time we find John in possession of a store at Ninetieth street, conducting it in the name of his brother, but alone familiar with its management, rendering no account whatever, and withdrawing from it such money as he pleased. We think that the only inference deducible from the evidence is that the giving of the bill of sale was a scheme to hinder, delay, and defraud creditors, and that it was error for the court below to dismiss the complaint.

The judgment should therefore be reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur.